Filed 3/16/21  P. v. Dunn CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>KEYLEN MALIK DUNN,<br><br>        Defendant and Appellant. | A155981<br><br>(Contra Costa County<br>Super. Ct. No. 051716232) |

Defendant Keylen Malik Dunn appeals from a judgment after a jury convicted him of second degree murder with use of a knife and second degree robbery.  He contends the trial court erred in instructing the jury and in admitting evidence under Evidence Code section 1101, subdivision (b).  He further contends his case should be remanded for a new hearing regarding whether he is entitled to mental health diversion pursuant to Penal Code section 1001.36.[1]  Last, he urges a reversal based on cumulative prejudice and/or ineffective assistance of counsel.  We affirm.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

1

The People charged defendant with the July 2016 murder of Eaen Hale (§ 187, subd. (a)) and further alleged he personally used a knife in the commission of that offense (§ 12022, subd. (b)(1)). The People also charged defendant with second degree robbery (§ 211) occurring in February 2016. The trial court consolidated the charges, and the first trial took place in early 2018. The jury found defendant guilty of robbery, but not guilty of first degree murder, and deadlocked as to second degree murder. On retrial to decide the murder count, the jury found defendant guilty of second degree murder and found the knife use enhancement true. The court sentenced defendant to 15 years to life for murder and imposed a two-year consecutive term for the robbery. The court imposed but struck the sentence for the knife use enhancement. The following is a summary of the evidence presented at the second trial.

## A. The Prosecution Case

On July 8, 2016, around 6:45 p.m., Bryan Abernathy was sitting in his truck at Kennedy Park in Richmond. In his rearview mirror, he saw that about 50 feet away from him, defendant was chasing Eaen Hale. Abernathy knew both defendant and Hale and considered them friends. He also knew defendant and Hale hung out together. Abernathy turned and watched defendant chase Hale around a car, then return to the park. During this initial chase, defendant got within about five feet of Hale, but Abernathy did not see defendant catch up to him or see anything in either of their hands.

Several minutes later, Abernathy saw defendant chase Hale across the street, then they went down to the ground, disappearing from Abernathy's view in front of another car. After about a minute or two, defendant "popped

up" and ran in front of Abernathy's truck holding what appeared to be a bloody knife.

At this point, Abernathy exited his truck and found Hale on his stomach in a pool of blood. Abernathy did not see any weapons near Hale. When Officer Alexis Bartley arrived at the scene, she found the victim lifeless. Abernathy told Bartley he saw a knife only when defendant was running away. Abernathy later told another officer that defendant was "5150," by which he meant crazy.

The prosecution introduced evidence of a 911 call Hale made at 6:47 p.m. the day of his death. The phone call begins with Hale telling the dispatcher that defendant popped his tires with a knife, hit him in the mouth, and would have stabbed him if he had not run away.[2] Hale then said that defendant, who had gone to the other side of the park, was coming back with "a long ass knife" and he had to get away. At this point in the call, Hale repeatedly yells things like, "I don't know what to do" and "Oh no."

Hale's autopsy revealed he died from a single stab wound to the chest, where the knife pierced his lung and aorta and was stopped by a vertebra. Hale also had small abrasions to his forehead and cheek that occurred around the same time as the stabbing. A police officer observed a fresh abrasion on defendant's left middle finger knuckle after his arrest.

The prosecution also introduced evidence of two uncharged prior acts under Evidence Code section 1101, subdivision (b), i.e., a robbery defendant committed in February 2016 and an incident at a bar where he fought with and threatened the bouncer.

---

[2]    A police officer at the scene testified she observed the victim's left front tire had been slashed.

### B. The Defense Case

Defendant took the stand and testified about his past and the circumstances up to the time of Hale's death. He was first hospitalized in a psychiatric ward when he was a teenager after having a nervous breakdown because he believed his mother was incorrectly preparing his food. He would barricade himself in his bedroom, and he was paranoid. He began taking psychiatric medications at around 13 or 14 years old and currently takes medications for schizophrenia and bipolar disorder. He fears being shot and killed because in his late teenage years, he was shot in the leg by someone who robbed him, and he also had friends die from being shot. He was homeless since 2014. A few weeks before Hale's death, defendant admitted himself to a psychiatric ward because he was out of medications, he thought he smoked "laced" marijuana, and he did not feel normal. He obtained medications during that hospitalization, but ran out at least a week before Hale's death and could not obtain a refill. On the day Hale died, the car that defendant had been sleeping in was towed away along with his belongings.

Defendant testified that he and Hale had been friends since defendant was a teenager and that he never wanted Hale dead. Hale was also homeless and slept around Kennedy Park in cars. The day Hale died, defendant was smoking marijuana in a restroom at the park when Hale came inside to smoke methamphetamine. After defendant lent Hale his lighter, Hale burned defendant's hand with his pipe while offering him methamphetamine. Defendant reacted by shoving Hale's hand away. Hale got upset and left. Defendant followed to get his lighter back, but Hale said he was angry and pulled out a knife. Hale then turned and ran away, and defendant gave chase because he wanted to know why Hale pulled out the knife and because he was concerned that Hale was going to retrieve a gun. Defendant testified

4

that Hale had previously told defendant he had guns, and defendant also heard "through the grapevine" that Hale had engaged in a shooting. Defendant chased Hale across the street, then Hale tripped and fell onto his own knife, which "planted into his chest."

Afterwards, defendant retrieved his shopping cart, which contained his belongings, and left the area. He never called for help or tried to help Hale. The police arrested defendant two days later. When asked at trial about three knives found in his shopping cart, defendant testified he did not know they were there, he had never seen them before, and he never carried knives.[3]

The defense also presented evidence regarding defendant's mental and cognitive functioning. One witness testified that, during the six weeks preceding Hale's death, he had observed and heard defendant acting erratically, including being nonresponsive to questions or making animal noises, and frequently screaming gibberish at the top of his lungs at night.

A licensed social worker working at the jail saw defendant in mid-July 2016, and recalled that defendant appeared unmedicated and "thought-blocked" (meaning there was a delay in his responses to questions), with apparent borderline intellectual functioning and an irrational, disorganized manner of speech. A jail psychiatrist testified that defendant has schizophrenia and that she treated him for psychosis in September 2016. Further, two experts testified about elevated levels of violence that homeless people face and how this impacts them, such as their reactions to perceived threats.

Additionally, the defense presented Dr. Jodi Couick, a school psychologist who assessed defendant in 2006 and determined he qualified for

---

[3]     The parties stipulated that all three knives found in defendant's shopping cart were tested for blood and the results were negative.

special education as a teenager. Her testing indicated that defendant scored in the range of 67–78 for cognitive ability, where the range for "intellectual disability" is around 70; that defendant had limited problem solving skills; and that he had faulty reasoning and poor "reality testing." Defendant's reality testing became weaker when dealing with emotional stimuli, and so "he might misperceive situations and not anticipate consequences" to his actions.

An expert in neuropsychology, Dr. Dale Watson, assessed defendant cognitively and found him mildly intellectually disabled with an IQ of 72. Among other things, Dr. Watson testified that defendant has frontal lobe dysfunction, which is generally associated with impulsivity and perseveration, and that he has schizophrenia and poor "reality testing" which is associated with poor judgment. Defendant also "elevated another index called the 'vigilance composite' " and "people who elevate this tend to be . . . hyper sensitive to threat, they're paranoid." Dr. Watson did not ask defendant anything about what happened on the day of or during the alleged murder or the prior robbery.

## DISCUSSION

### A. Instruction on Involuntary Manslaughter

During trial, defense counsel requested an instruction on involuntary manslaughter, arguing the evidence supported the theory that defendant brandished a knife—a misdemeanor—with criminal negligence. Defendant contends the trial court's refusal to give the requested instruction was error.[4] We do not agree.

---

[4]     The trial court did instruct the jury as to second degree murder, and the lesser included offense of voluntary manslaughter under the theories of heat of passion and imperfect self-defense.

6

### 1. Legal Principles and Standard of Review

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice can be express or implied. (§ 188, subd. (a).) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) "It is implied when the defendant engages in conduct dangerous to human life, ' "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." ' " (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30 (*Brothers*).)

Involuntary manslaughter is a lesser included offense of murder (*Brothers*, *supra*, 236 Cal.App.4th at p. 30) and refers to a killing that occurs during the commission of "an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, [accomplished] in an unlawful manner, or without due caution and circumspection" (§ 192, subd. (b)). Section 192 broadly encompasses "an unintentional killing in the course of a noninherently dangerous felony committed without due caution or circumspection." (*Brothers*, at p. 31.) "The words 'without due caution and circumspection' refer to criminal negligence—unintentional conduct which is gross or reckless, amounting to a disregard of human life or an indifference to the consequences." (*People v. Evers* (1992) 10 Cal.App.4th 588, 596.) While both implied malice murder and involuntary manslaughter involve a disregard for life, "[i]mplied malice murder requires a defendant's conscious disregard for life, meaning that the defendant subjectively appreciated the risk involved. [Citation.] In contrast, involuntary manslaughter merely requires a showing that a reasonable person would have been aware of the risk." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1008.)

7

A trial court must instruct " 'on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.' " (*People v. Souza* (2012) 54 Cal.4th 90, 116.)  " 'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial,' " that is, there must be " 'evidence from which a jury composed of reasonable persons could conclude "that the lesser offense, but not the greater, was committed." [Citation.]  "On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense." ' " (*Ibid.*)

    *2. Analysis*

Defendant claims he was entitled to an involuntary manslaughter instruction on two grounds.  First, the jury could have believed that he killed the victim without malice while committing the misdemeanor brandishing of a knife.  Based on a combination of Abernathy's testimony, the 911 call, and his own testimony, he suggests the jury could have believed that:  defendant had a knife; he "chased after Hale while holding the knife, but without pointing the knife at Hale," so he was "merely brandishing the knife"; and "[w]hen [defendant and Hale] went behind a parked car, and disappeared from Abernathy's view, Hale slipped and fell on the knife."[5]

---

[5]    Defendant's suggestion that his chasing Hale with a knife was merely brandishing lacks any legal support and is belied by the record.  "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.)  "A defendant has the ' " 'present ability to injure' " ' ' "[o]nce [he] has attained the means and location to strike immediately." ' " (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 85.)  With regard to the second chase closest in time to the Hale's stabbing, Abernathy testified that defendant started running after Hale when defendant was five feet away from him and, before the two went to the ground, they were "really close" to each other, "[a] couple of feet maybe at most."  Considering the

8

The problem with this is that defendant's proposed scenario lacks evidentiary support. While highlighting Abernathy's testimony as indicating that he had a knife when he chased Hale, defendant points to no evidence showing that he chased Hale "without pointing the knife at Hale." Furthermore, there was no evidence indicating Hale slipped and fell on defendant's knife. Defendant specifically denied ever having a knife and testified Hale tripped and fell on Hale's own knife, so defendant's testimony does not support his proposed scenario. Neither did the prosecution's evidence, which showed that defendant had a knife and intentionally stabbed Hale. In short, the evidence did not support a theory that Hale was accidentally stabbed in the course of defendant merely brandishing a knife, as he suggests.

Alternatively, defendant claims he was entitled to an involuntary manslaughter instruction because the mental health evidence supported the theory that "a person with [his] mental impairments could have acted without implied malice because he lacked the subjective awareness that his conduct carried a high degree of probability that it will result in death. [Citation.] A person with schizophrenia and with [his] other mental impairments could have brandished or wielded a knife without the intent to kill, because he lacked the ability to think things through to the end."

Here, the evidence showed that, during the first chase, defendant popped Hale's car tire with a knife, threatened him, and "definitely" would have stabbed him had he not run away. Minutes after the first chase, defendant returned from across the park and chased Hale again, ending with Hale fatally wounded and defendant holding a bloody knife. Considering this

circumstances, defendant had the present ability to strike Hale and commit a violent injury.

9

evidence and the record as a whole, there was nothing to indicate that defendant did these actions without intending to kill Hale or with a failure to grasp the risk of his actions. Indeed, defendant testified that he knows stabbing someone in the chest is dangerous to life. And Dr. Watson offered testimony that someone with defendant's IQ is generally smart enough to know that stabbing someone is dangerous to human life.

Defendant additionally asserts that a person with his conditions "could have acted without the intent to kill, because homeless people have hair-trigger tempers and respond quicy and inappropriately to anything they see as a threat." Further, he claims, he "could have lacked the intent to kill, because Hale was his friend." This is unpersuasive. Whether a hypothetical person could have acted without intent to kill for these reasons is not substantial evidence that defendant personally lacked express or implied malice.

In sum, the trial court did not err in refusing to instruct on involuntary manslaughter.

## B. Instruction on Accident

Defendant argues that he was entitled to an instruction concerning the defense of accident, that the trial court misinstructed on the defense of accident, and that the court had a duty to instruct correctly on accident.

No basis for relief appears. " 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.] ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 822.) A claim of

10

instructional error is reviewed de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

To have misinstructed on the defense of accident, the trial court must have instructed on it. Here, the court never instructed on it. Defendant, however, highlights the following verbal statement that the court made to the jury prior to instructing on murder: "There is no claim in this case that there's a legally permissible excuse for the second degree murder charge except to the extent that there is a claim that the defendant did not have and the proof does not show beyond a reasonable doubt that he had the specific intent to commit the crime itself. Alternatively, that the event that happened was an accident, that he took no participation in or caused the death of the victim, Mr. Hale. So there is testimony from the defendant that the stabbing injury took place without his involvement in it."[6] On appeal, defendant contends this oral statement amounted to an erroneous instruction on the defense of accident.

This statement cannot reasonably be viewed as an instruction on the defense of accident. The trial court was telling the jury there was no defense other than defendant's claims that (1) the evidence failed to prove the mens rea of the offense, or (2) the evidence failed to prove the necessary actus reus because *the victim accidentally stabbed himself* causing his own death. The court never indicated defendant had a possible defense on the ground that *defendant* accidentally stabbed the victim. Because the court never instructed on the defense of accident, it cannot be said the court misinstructed on that defense.

---

[6] The trial court did not provide the jury a written instruction corresponding to this verbal statement.

As for defendant's claim that the trial court had a duty to instruct on accident, we reject the claim. A court has no sua sponte duty to instruct on the defense of accident; such an instruction generally must be requested. (*People v. Anderson* (2011) 51 Cal.4th 989, 996–997.) Here, defendant concedes his trial counsel did not request an instruction on accident at the second trial.

Defendant raises two arguments for why he believes the trial court had a sua sponte duty to instruct on accident. First, relying on the same alleged verbal misinstruction quoted above, defendant argues the court "acquired the sua sponte duty to give a correct instruction on accident" when it gave the alleged misinstruction. Having already concluded that the quoted statement was not an instruction on the defense of accident, we find this claim without merit.

Second, defendant contends the trial court refused his request to give an accident instruction at the first trial and, before the second trial, the court indicated its rulings at the first trial would stand. As such, he "did not have to repeat at the second trial his request for an instruction on accident in order to preserve this issue." We are unpersuaded.

The portions of the record that defendant cites to support this argument disclose that the trial court indicated its prior rulings on motions in limine and concerning the admission of evidence from the first trial would stand unless the parties asked for reconsideration. Defendant's motions in limine from the first trial did not include a request for an accident instruction. Moreover, at the jury instruction conference during the second trial, defense counsel had every opportunity to ask for an accident instruction if she felt the evidence warranted it. She did not do so.

Finally, and in any case, defendant fails to show he was entitled to an accident instruction. Defendant suggests that such an instruction was required because a combination of prosecution and defense evidence tended to show that he "did not brandish the knife. He merely held it down by his side. Then Hale stumbled and accidently fell on the knife." As already discussed, there was no evidence supporting the theory that Hale was accidentally stabbed as defendant was merely brandishing a knife. Similarly, there was no evidence that defendant merely held a knife that the victim fell onto.

In sum, we reject defendant's claims of instructional error concerning the defense of accident.

## C. Evidence Code Section 1101, Subdivision (b)

Defendant contends the trial court erred in admitting evidence under Evidence Code section 1101, subdivision (b) ("section 1101(b)"). We find no error.

### 1. Additional Facts

During trial, the court permitted the prosecution to introduce evidence of prior acts under Evidence Code section 1101(b) to prove that defendant, despite his cognitive and mental health issues, could and did engage in goal-oriented behavior and form the intent necessary for murder. That evidence was follows.

First, in February 2016, defendant attacked a man, Dorotheo S.,[7] in front of a liquor store next to Kennedy Park and took his bicycle.[8] Dorotheo

---

[7] We refer to the victims of these other crimes by their first names and last initials to protect their privacy interests. (Cal. Rules of Court, rule 8.90(b).)

[8] This incident was the basis for the robbery charge that the jury convicted defendant of at his first trial.

13

S. testified defendant took him by surprise, pushing him off of his bicycle which fell on top of him, then hit him repeatedly even as he tried crawling under a car to stop the attack. Defendant also kicked Dorotheo S. after obtaining the bicycle. Later, when Officer Marshal Pagaling and another officer located defendant in the park with the bicycle and called to him, defendant responded, "are you here for the bike," then walked away. Eventually defendant started running and ignored orders to stop. When Pagaling was about 18 feet from defendant, defendant stopped and turned with his fists clenched, refusing to comply with orders to get on the ground. Pagaling forced him to the ground and handcuffed him.

Second, in 2013, a bouncer at a bar, William S., asked defendant to leave the bar after a woman complained defendant was drinking her beverages while she was on the dance floor. After William S. escorted defendant to the door, defendant insulted and cursed at him, and threatened to "kick [his] butt." In front of the bar, defendant took a swing at William S. and missed, then William S. hit him. Defendant fell to the ground, then went to a garbage can and threw garbage at William S. The incident ended when an officer arrived at the scene. A week later, defendant stood across the street from the bar with his hand behind his back and told William S. he was going to shoot him. William S. took a step toward the defendant, a sort of lunge, but defendant stayed put. At that point, William S. thought that if defendant had a gun he would use it, so William S. "challenged" defendant and went after him. Defendant ran, throwing a rolled-up magazine and a bottle at William S. in the process. William S. testified defendant "didn't have a gun on him that I saw. Just acted like he appeared to have one."

With regard to the prior robbery evidence, defendant testified he unintentionally pushed Dorotheo S. off the bicycle after Dorotheo S. ran over

14

his foot. Defendant also testified that he took the bicycle because it belonged to him, and that the whole incident was an accident. Concerning the first fight with William S., defendant admitted the two fought outside of the bar, but denied being aggressive or upset at William S., and claimed he was "cool, calm, and collected" even while they fought. As for the second incident, defendant said he merely walked past the bar. He denied threatening William S., pretending to have a gun, or throwing anything at him.

Regarding the prior acts evidence, the trial court instructed the jury with CALCRIM No. 375, as modified to include the elements of the crimes of robbery and criminal threats. The court instructed that the jurors must first decide if the People proved defendant committed these crimes by a preponderance of the evidence. If they decide the issue in the negative, then they must disregard the evidence entirely. If, however, the jurors decide the People carried their burden of proof, then they could consider the evidence only as a factor in determining if defendant had express or implied malice as required for second degree murder or voluntary manslaughter and for no other purpose.

### 2. *Legal Principles and Standard of Review*

Evidence Code section 1101(b) permits the admission of an uncharged crime or other act when relevant to prove some fact other than the defendant's propensity to commit such an act, such as intent. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 394, fn. 2.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e.,

15

criminal, intent accompanying such an act . . . .' [Citation.] In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*Id.* at p. 402.) Evidence of uncharged offenses must have substantial probative value to be admissible, given the substantial prejudicial effect inherent in such evidence. (*People v. Rogers* (2013) 57 Cal.4th 296, 331.) We review rulings on the admission of evidence under Evidence Code sections 1101(b) and 352 for abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 667–668.)

### 3. *Evidence of the 2016 Robbery*

Defendant contends there was insufficient similarity between the charged homicide and the robbery evidence for the latter to be admissible under Evidence Code section 1101(b). He also argues the robbery evidence should have been excluded under Evidence Code section 352. We see no abuse of discretion.

As discussed, defendant presented evidence at trial concerning his mental and cognitive disabilities. (See *ante*, pp. 5–6.) For example, Dr. Couick determined from one test that defendant had limited problem solving skills, which could affect a person's ability to anticipate consequences. Dr. Couick also determined, based on the Rorschach Ink Blot Test, that defendant had poor reality testing and that when dealing with emotional stimuli, defendant "might misperceive situations and not anticipate consequences" to his actions. Dr. Watson testified that defendant has, among other things, an intellectual disability, frontal lobe dysfunction, and schizophrenia. Hypothetically, Dr. Watson opined, a person with defendant's psychiatric and cognitive disabilities could overreact or react impulsively to a stressful situation. Also, hypothetically, defendant's psychiatric and

16

cognitive disabilities could and likely would impair a person's appreciation of the risk of his own actions, and his mental illness could affect someone's perception of the need to defend themselves.

During closing argument, defense counsel relied on the mental health evidence to argue that (1) defendant could not or did not act with intent to kill or subjectively appreciate the risks of his actions as required for implied malice; (2) defendant acted rashly in the heat of passion, after being provoked; and (3) he subjectively believed he was in danger and had to defend himself with deadly force, and thus acted in imperfect self-defense.

We see no abuse of discretion in the trial court's admission of the robbery evidence. The evidence that defendant took the bicycle from the victim and that he later avoided the police reasonably supported the inference that defendant was capable both of acting with intention and toward a goal, and of understanding action and consequence. As the evidence was plainly probative on the issue of whether defendant could and did form the mental state necessary for murder, it was admissible under Evidence Code section 1101(b).

Contrary to defendant's assertion, Evidence Code section 352 did not require exclusion of this highly probative evidence. The circumstances of the robbery were not particularly inflammatory, especially compared to the circumstances of the charged murder. (*People v. Lindberg* (2008) 45 Cal.4th 1, 25.) Furthermore, the trial court gave a limiting instruction advising the jurors they could not conclude from the evidence that defendant has a bad character or is disposed to commit crime. This instruction, which we presume the jurors followed, mitigated any possibility of prejudice. (*Id.* at pp. 25–26.)

17

In sum, the trial court did not err or abuse its discretion in admitting the evidence of the robbery.

### 4. *Evidence of the Incidents involving William S.*

Defendant contends the trial court erred in admitting the evidence of his threats to kick William S.'s "butt" and to shoot William S. because the evidence fell short of satisfying the various elements of the crime of criminal threats. Relatedly, he claims the court erred in giving its CALCRIM No. 375 instruction with regard to the evidence that he threatened to shoot William S. He also contends that the incidents were insufficiently similar to the charged murder to be admissible to prove malice under Evidence Code section 1101(b), and that the court should have excluded them under Evidence Code section 352.

We first address the People's contention that defendant forfeited his claims concerning the admissibility of the William S. evidence by failing to object below. To preserve appellate review of an issue concerning the admission of evidence, there must be "an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353, subd. (a); *People v. Valdez* (2012) 55 Cal.4th 82, 130.) Here, although defendant asserts he objected to the admissibility of the William S. evidence, his opening brief does not point to any specific objection to that evidence under Evidence Code section 1101(b).

In his reply brief, defendant cites to a motion in limine in which he generally objected to the admission of prior acts evidence under Evidence Code sections 1101(b) and 352, including his arrest after his "throw[ing] glass" at William S. To preserve the issue on appeal, however, a motion in limine must satisfy the basic requirements of Evidence Code section 353, i.e.,

18

"(1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context." (*People v. Morris* (1991) 53 Cal.3d 152, 190.)  Here, defendant's motion did not clearly identify either of the incidents involving William S. or the threats defendant allegedly made to William S., nor did it object to any prior acts evidence as failing to satisfy the elements of the crime of criminal threats as defendant argues now.  Further, after the prosecutor asked to introduce William S.'s testimony and proffered a summary of it, defense counsel offered no objection on the grounds raised in this appeal.  Thus, defendant failed to preserve the issue of admissibility for review.

That said, the record does show that defense counsel objected to the trial court instructing the jury about criminal threats with CALCRIM No. 375, the standard Evidence Code section 1101(b) instruction. Specifically, counsel objected that there was no testimony from William S. concerning any "sustained fear," which is an element of the criminal threats offense.  While that objection did not preserve defendant's claim about the admissibility of the evidence, it was sufficient to preserve his challenge to the propriety of the instruction based on insufficient evidence of a criminal threat.  As to this claim, however, defendant fails to show error.

"Under the Evidence Code, the truth of the prior uncharged act and defendant's connection to it are preliminary factual issues." (*People v. Garelick* (2008) 161 Cal.App.4th 1107, 1115.)  " '[O]rdinarily, determining the relevance of proffered "other act" evidence presents solely a question of law for the court because the defendant does not dispute the fact of the prior act but merely argues its legal inadmissibility.' [Citation.]  But if a defendant

19

claims he did not commit the other acts at issue, this ultimately presents a question of fact 'which must be resolved by the jury before it can draw any inference regarding defendant's commission of the charged offense.' " (*People v. Lucas* (2014) 60 Cal.4th 153, 219.)

Here, defense counsel objected to the instruction on the ground that defendant did not commit the crime of making a criminal threat. But by that point, the evidence had already been admitted, and whether defendant committed the prior crime was a question of fact for the jurors to resolve. Accordingly, after instructing on the elements of the crime of making a criminal threat, the trial court properly instructed the jurors to consider the criminal threats evidence only if they determined that the People proved, by a preponderance of the evidence, that defendant in fact committed that offense.

Defendant provides no authority supporting a different conclusion. He cites *People v. Martinez* (1992) 10 Cal.App.4th 1001 and *People v. Hernandez* (1997) 55 Cal.App.4th 225, but those cases are inapposite. *Martinez* determined the trial court abused its discretion in admitting expert evidence concerning other vehicle theft crimes to prove the defendant's guilt for offenses related to a vehicle theft, without requiring proof of the defendant's connection to the other crimes. (*Martinez*, at pp. 1002, 1004–1008.) Similarly, *Hernandez* held that a court abused its discretion in admitting information from a computer sex crimes database to prove the defendant's identity as the perpetrator of the charged crimes, even though the information concerned crimes that had not been linked to the defendant. (*Hernandez*, at pp. 227, 243.) Neither *Martinez* nor *Hernandez* discussed Evidence Code section 1101. Finally, defendant's bare citation to the bench

notes of CALCRIM No. 375 is unhelpful, as he fails to address its possible relevance here.

In sum, we reject defendant's claims that the evidence pertaining to the 2016 robbery and the threats against William S. was improperly admitted.

## D. Unanimity

Defendant contends the trial court erred when it failed to give a unanimity instruction with regard to the two threats defendant allegedly made to William S., i.e., defendant's threat to kick William S.'s "butt" and his threat to shoot him.

The requirement of unanimity applies to verdicts on charged offenses. (See *People v. Russo* (2001) 25 Cal.4th 1124, 1132; *People v. Beardslee* (1991) 53 Cal.3d 68, 92.) Defendant cites no authority, and we know of none, that requires unanimity before a jury can consider evidence of prior acts admitted under Evidence Code section 1101(b). Defendant presents no developed argument why the requirement of unanimity should apply to evidence admitted pursuant to Evidence Code section 1101(b). We thus reject defendant's contention. (See *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.)

## E. Section 1001.36

In June 2018, after the jury rendered its verdict in the second trial, section 1001.36 became effective. (Stats. 2018, ch. 34, § 24.) Section 1001.36 authorizes courts to grant pretrial diversion to defendants charged with a misdemeanor or felony who, inter alia, have a qualifying mental disorder, such as schizophrenia. (§ 1001.36, subds. (a), (b).)

Prior to sentencing, defendant requested that the trial court place him on diversion under this new law. At the December 2018 sentencing hearing, the court indicated it assumed defendant was potentially eligible for

diversion under the new law, despite the fact that a jury already convicted him of murder and despite the circumstance that an amendment to the law going into effect January 1, 2019 made defendants charged with various crimes, such as murder, ineligible for diversion. (Stats. 2018, ch. 1005, § 1.) Ultimately, the court found defendant did not qualify for diversion because he would pose an unreasonable risk of danger to the community if placed on diversion.

Defendant claims the trial court abused its discretion when it denied his request for diversion under section 1001.36. He requests that we remand this case to the trial court for reconsideration of whether to place him on diversion. We are not persuaded.

Effective January 1, 2019, section 1001.36 was amended to provide that a defendant is ineligible for diversion under the statute if charged with murder. (§ 1001.36, subd. (b)(2)(A); Stats. 2018, ch. 1005, § 1.) Under the law as it presently stands, defendant is ineligible for diversion. Moreover, as the Supreme Court explained, a conditional reversal for an eligibility hearing under section 1001.36 restores a case to "its procedural posture before the jury verdict for purposes of evaluating defendant's eligibility for pretrial mental health diversion." (*People v. Frahs* (2020) 9 Cal.5th 618, 639.)

Here, the procedural posture of defendant's case before he was convicted of murder was that he stood charged with murder, which is sufficient by itself to prohibit diversion under the statute. Because granting the requested remand for reconsideration of diversion would be an idle act, which the law does not require (Civ. Code, § 3532), we decline defendant's request.

Defendant argues that section 1001.36 applies retroactively to him, but that the January 1, 2019 amendment does not. This is so, he claims, because

22

the amendment was not in effect when he requested diversion, and application of the 2019 amendment would violate ex post facto principles. This is meritless.

"A statute violates the prohibition against ex post facto laws if it punishes as a crime an act that was innocent when done or increases the punishment for a crime after it is committed." (*People v. White* (2017) 2 Cal.5th 349, 360.) Underlying the prohibition on ex post facto laws is the right to fair notice of what is unlawful and what punishment such laws might incur. (*In re Vicks* (2013) 56 Cal.4th 274, 287; *Weaver v. Graham* (1981) 450 U.S. 24, 30.) Here, the January 1, 2019 amendment specifying a murder exclusion does not punish previously innocent conduct, nor does it increase the punishment for a defendant's crime after its commission. Indeed, the law was not even in effect when defendant committed his crime. We thus reject defendant's ex post facto claim. (*People v. Cawkwell* (2019) 34 Cal.App.5th 1048, 1054, review granted Aug. 14, 2019, S256113, review dismissed Aug. 26, 2020; *People v. McShane* (2019) 36 Cal.App.5th 245, 259–260, review granted Sept. 18, 2019, S257018, review dismissed Aug. 26, 2020.)

## F. Cumulative Prejudice

Finally, defendant claims reversal is warranted because of cumulative prejudice from the claimed errors, and because of ineffective assistance of counsel. Because defendant has failed to demonstrate any error, we reject his claim of cumulative prejudice. With regard to defendant's ineffective assistance claim, defendant offers no explanation as to what that claim is based on, and he fails to provide record citations and authority in support. Accordingly, we decline to consider the claim further. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785.)

**DISPOSITION**

The judgment is affirmed.

_____

Fujisaki, Acting P.J.


WE CONCUR:


_____

Petrou, J.


_____

Wiseman, J.*


A155981

_____

*      Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25